UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JEFFREY DEL FUOCO,

          Plaintiff,

v.                            CASE No. 8:03-CV-161-T-23TGW

CHARLES B. WELLS, et al.,

          Defendants.

_____

O R D E R

        In this case, a former defendant, Sheriff Charles B. Wells, has filed a motion for sanctions against the plaintiff, Jeffrey Del Fuoco, and his counsel, Craig Huffman (Doc. 99). Wells alleges that, at a settlement meeting, Del Fuoco threatened to file a complaint with the Florida Elections Commission relating to alleged campaign finance violations if Wells did not pay him $500,000, plus an attorney's fee, as a settlement of this case. Huffman and Del Fuoco also filed a motion seeking sanctions or, in the alternative, court intervention for Wells' counsel's alleged attempt to interfere with Huffman's representation of Del Fuoco (Doc. 147).

        The evidence presented at an evidentiary hearing unquestionably established that the plaintiff and his attorney sought to obtain a settlement of

this case for $500,000, plus an attorney's fee – an amount far in excess of any credible value of the case – in exchange for not disclosing alleged campaign violations by the Sheriff, who was then conducting a re-election campaign. This conduct, as well as the submission of a false affidavit regarding the meeting, was clearly improper and warrants the imposition of sanctions. Consequently, as requested by the Sheriff, he will be awarded a recovery of reasonable attorneys' fees resulting from the filing of the second amended complaint.

On the other hand, the plaintiff's motion for sanctions is procedurally flawed and meritless.  Accordingly, it will be denied.

## I.

On January 31, 2003, Jeffrey Del Fuoco, an Assistant United States Attorney ("AUSA") in the Middle District of Florida, filed a civil complaint against Charles B. Wells, who is the Sheriff of Manatee County, a John Doe deputy from Manatee County, and Lola Foy, an employee of the Manatee County Sheriff's office (Doc. 1).  The complaint alleged that the John Doe deputy caused Foy improperly to run Del Fuoco's and his wife's license numbers and vehicle tags through the Florida Department of Highway Safety and Motor Vehicles data base in violation of 18 U.S.C. 2721 et. seq.

On July 7, 2003, Del Fuoco amended his complaint and identified deputy Barry Colman as the one who asked Foy to access the information (Doc. 21). All three defendants filed motions to dismiss (Docs. 23, 24, 46). On June 14, 2004, District Judge Steven D. Merryday granted Foy's and the Sheriff's motions to dismiss with leave for Del Fuoco to file an amended complaint (Doc. 74).

On July 30, 2004, Del Fuoco filed a second amended complaint (Doc. 80). Foy was not named in the complaint. Instead, Del Fuoco sued Sheriff Wells and deputies Larry Bahnsen and Barry Colman. In essence, the second amended complaint alleged in count I that the defendants conspired to impede Del Fuoco's ability to investigate and uncover illegal activities by the Sheriff and his office. In support of this claim, Del Fuoco alleged that he successfully prosecuted officers from the Delta squad of the Manatee County Sheriff's office. He alleged further that the conspiracy prevented him from discharging his duties as an AUSA in his continued investigation and prosecution of the Sheriff and his deputies. On August 17, 2004, Wells filed a motion to dismiss the second amended complaint (Doc. 83).

That same day, by letter, Del Fuoco's attorney, Craig Huffman, requested a meeting to discuss a possible settlement. The letter to the Sheriff's attorney stated (Def. Ex. 1):

> It would be [in] your client's interest to [meet] before certain next steps may be taken by my client.... We will make clear to you our stance on other matters which will become issues for your client if settlement can not be reached.

Wells thought this letter was accusatory on its face and gathered that the plaintiff had adverse information about him, his family or his office. Accordingly, he not only agreed to a meeting, but insisted upon attending one. A meeting was consequently held at a conference room at the Tampa offices of Holland & Knight, the Sheriff's counsel, on August 20, 2004.

Also, Wells later on August 20 served Huffman with a Rule 11, F.R.Civ.P., motion for sanctions for filing a meritless second amended complaint. On September 9, 2004, within the twenty-one day safe harbor period provided by Rule 11, Del Fuoco voluntarily dismissed Wells from the case (Doc. 95).

Thereafter, on September 23, 2004, Wells filed a motion for sanctions seeking relief based on the court's inherent authority (Doc. 99). The motion asserted that Del Fuoco and Huffman filed a meritless lawsuit against

Wells with the intention to publicly harass him during his political campaign for Sheriff in 2004 (id.).  The motion also alleged that their conduct at the settlement meeting amounts to extortion and that Huffman violated the Florida Rules of Professional Conduct because he and Del Fuoco demanded a sum of money based upon allegations wholly unrelated to the filed civil case.  In that motion, Wells requested the court to impose sanctions upon Huffman and Del Fuoco, including an award of attorneys' fees and costs.  Alternatively, he requested a monetary sanction against the plaintiff and Huffman based on their financial ability to pay (id. at p. 17).

On September 29, 2004, an order was entered dismissing Wells from the case (Doc. 100).  Subsequently, on October 25, 2004, Del Fuoco filed his third amended complaint against defendants Bahnsen and Colman (Doc. 118).  In November 2004, defendants Bahnsen and Colman filed motions to adopt Wells' motion for sanctions, and each sought dismissal of the case (Docs. 125, 130).  The motions to adopt were granted (Doc. 157).

On, January 7, 2005, Del Fuoco and Huffman filed a Motion for Sanctions or in the Alternative Motion for Court Intervention to Prevent further Actions by Defendant tor [sic] his Counsel (Doc. 147).  The motion

alleged that Wells' counsel threatened Huffman with ethical and Florida Bar actions unless he withdrew from the case (Doc. 147).

Both parties' motions for sanctions have been referred to me for disposition (Docs. 110, 131). It was evident from the submissions that an evidentiary hearing was necessary, at least with respect to the Sheriff's motion. In order to organize such a hearing, a status conference was held on March 2, 2005 (Doc. 158). At the conference, the parties were directed to meet and prepare a stipulation of facts, exhibit lists, witness lists, and to specify the issues that remain to be heard. On July 15, 2005, the Friday before the evidentiary hearing was to begin, Wells unilaterally filed his statement of the issues to be resolved, an exhibit list, and a witness list (Doc. 201). His statement of the issues to be considered at the hearing narrowed the issues to what occurred at the August 20, 2004, meeting, and whether the plaintiff's affidavit about that meeting was false (id. at p. 2). Huffman and Del Fuoco untimely filed their witness list and exhibit list at 6:56 p.m. on Sunday, July 17, 2005, the day before the hearing (Doc. 204). They provided no separate statement of the issues to be considered at the hearing. The evidentiary hearing was held, as scheduled, on July 18, 2005.

II.

As indicated, the focus of the evidentiary hearing was the meeting of August 20, 2004. That meeting took place about 10:00 a.m. in a conference room at the Tampa offices of Holland & Knight. There were six people attending the meeting: Del Fuoco, Huffman, Wells, and Holland & Knight attorneys Carol Masio McGuire, David Borucke, and, by telephone from McLean, Virginia, James Rodio. At the hearing, testimony was received from Borucke, Rodio, Wells, and Del Fuoco, although the other two participants at the meeting were also present.

A summary of the testimony of each witness will be set forth. That approach not only clearly explains what took place at the meeting, but demonstrates that the plaintiff did not meaningfully dispute the account given by the witnesses for Wells.

A.  <u>Borucke</u>.

Borucke, a partner at the law firm of Holland & Knight, was the first witness called to testify. He explained that he did not become involved in the case until August 10, 2004, when he was asked to help with some of the motions (Doc. 210, p. 19). McGuire asked Borucke to attend the meeting to take notes. At that point, Borucke did not know the purpose of the meeting, but surmised that it related to settlement discussions (<u>id</u>. at pp. 20, 49).

According to Borucke, Huffman began the meeting with an introduction and commented on the case's litigation, the parties' previous unsuccessful attempt to settle, and said that it was time to revisit the issue of settlement (id. at p. 24). Huffman only spoke for approximately one minute before stating that his client, Del Fuoco, had something to say.

At that point, Del Fuoco spoke for about five minutes. During his comments, Del Fuoco discussed the litigation and added that he had conducted a personal investigation into certain matters. Borucke testified (id. at pp. 27-28):

> He [Del Fuoco] said that during the course of litigation, he had conducted a personal investigation of Sheriff Wells, and that he had spoken to numerous people and that he had learned that Sheriff Wells was engaged in criminal activity.

> He said that he felt duty bound to report that criminal activity, but that if we could reach a settlement of that litigation by the end of the day, that he would go away and never bother Sheriff Wells again.

> He also said that he was prepared that day to swear out an affidavit and to file a complaint setting forth probable cause based on the criminal activities.

At this point, McGuire inquired what he meant by criminal activity. Del Fuoco then pushed toward McGuire and Wells a copy of a

complaint that he had prepared previously for the Florida Elections Commission ("FEC").  The FEC complaint stated that it was brought by the plaintiff against the Sheriff individually (Wells Ex. 2). It also indicated that the complaint had been filed with the state attorneys' offices for the eleventh and twelfth judicial circuits (id.).  Although the complaint states "[p]lease see attached statement" (id.), no document accompanied the complaint.

Borucke testified further that Del Fuoco stated that Wells was involved in campaign violations and in that connection mentioned a Benny Klepach (Doc. 210, p. 31).  Borucke testified that he believes it was at this point that Del Fuoco made his settlement demand of $500,000, plus an attorney's fee (id. at p. 32).  Notably, this is the same figure that was sought at the prior unsuccessful mediation.

Upon this demand, attorney Rodio, to clarify what was being said,  asked whether he understood the plaintiff correctly in that, if the case did not settle for $500,000, plus an attorney's fee, then a criminal complaint would be filed (id. at p. 33).  Huffman responded that it would be an administrative complaint (id.).  Rodio then followed up by asking whether, if the $500,000, plus an attorney's fee, is not paid, then an administrative complaint would be filed (id. at pp. 33-34).  According to Borucke, Huffman

agreed with that position.  Borucke added that he was not sure if Del Fuoco

agreed because, right after that, Del Fuoco said he was going to pursue a fraud

claim against Wells (id. at p. 34).

At this point, Wells became angry, but remained seated, and

responded that he did not have to wait to give his answer to Del Fuoco (id. at

p. 53).  Rodio counseled Wells not to respond, and Wells agreed (id. at p. 35).

Borucke testified that Del Fuoco stated numerous times that the

deadline was 5:01 p.m. that day for Del Fuoco to receive an answer;

otherwise, the complaint would be filed (id.).  Del Fuoco also said that no one

else knows about the alleged campaign violations (id. at p. 39).

Borucke explained that the meeting lasted approximately a half

hour and the atmosphere was intense, but not hostile (id. at pp. 59, 61).[1]  At the

end of the meeting, Borucke asked Del Fuoco and Huffman to wait in another

conference room while the others discussed the matter.  Del Fuoco and

Huffman initially waited, but then left.

B.  Rodio.

Rodio, a partner with Holland & Knight, testified along the same

lines as Borucke.  Rodio attended the meeting on August 20, 2004, via

---

[1]Borucke did not recall whether defendants Colman and Bahnsen were discussed during the meeting (Doc. 210, p. 69).

telephone  from his office in Virginia (Doc. 210, p. 72).  The meeting was held because certain allegations were raised in Huffman's letter dated August 17, 2004.  Rodio believed these allegations were new and he wanted to know what they were (id. at pp. 72, 93).  He testified the meeting lasted less than a half hour.

Rodio added to Borucke's testimony that Del Fuoco talked about how he can investigate a case and put a case together (id. at p. 75).  Rodio testified that Del Fuoco also said either that he was "duty bound," or had an obligation, to report the violations (id.).  According to Rodio, Del Fuoco in cryptic terms mentioned FEC violations and about "Benny" (id. at p. 93).  Rodio testified that Del Fuoco said he would go away if he was paid the $500,000, plus an attorney's fee.   Rodio also did not recall if defendants Colman and Bahnsen were discussed at the meeting (id. at pp. 107, 108).

Rodio explained that he focused on what Del Fuoco said about wanting a $500,000 payment and that he would file a criminal complaint if the payment was not received (id. at pp. 73, 93-94).  Consequently, Rodio asked whether he understood the statement correctly in that, if his client does not pay Del Fuoco the $500,000, then a criminal complaint would be filed (id. at pp. 73-74).  Rodio explained that a voice on the other end of the phone

responded, "no, it will be an administrative action" (id. at p. 74).   Rodio followed up with the question, "let me get his straight, that if my client ... doesn't pay your client $500,000 plus attorney[']s fees, then you're going to file an administrative complaint with the Florida Elections Commission" (id.). A voice on the phone replied, "yes, that's correct" (id.).   Rodio testified that there was no doubt in his mind that this demand was made.

Because Rodio was not physically present at the meeting, he did not see the FEC complaint until afterward (id. at p. 73).   In the early afternoon of the same day, Rodio received a faxed letter from Huffman.[2]  Attached to the letter was a revised FEC complaint (Plt. Ex. 4).   The letter explained that Wells' attorneys were erroneously handed a copy of the FEC complaint that indicated the complaint would be filed with the state attorney's offices (id.). The letter explained that the FEC complaint would not be filed with the state attorneys' offices.   Rather, the FEC complaint was an administrative action, and Huffman and Del Fuoco would "let the Election Commission proceed as they are duty bound to do" (id.).   The letter also stated that, if a settlement is reached, Huffman and Del Fuoco would not "proceed against either Mr.

---

[2]The letter was also faxed to McGuire (Plt. Ex. 4).

Bahnsen or Mr. Colman" (id.).  An extension was given for a response to 5:10 p.m. that day (id.).

Rodio testified further that, after the meeting, he looked at the Florida statute relating to extortion (Doc. 210, p. 91).  During a telephone conference between Rodio, Borucke and Huffman later that day, Rodio informed Huffman that he was disturbed about what happened at the meeting and that Huffman's and Del Fuoco's conduct looked like extortion (id.). Huffman attempted to dissuade Rodio from his view and responded that they were not going to file a criminal complaint (id. at pp. 91, 92).  However, Rodio replied that he was not sure if that mattered since what happened at the meeting could not be changed (id. at p. 92).  Moreover, in Rodio's view, the nature of the complaint was irrelevant.

Rodio testified, in addition, that Huffman and he exchanged correspondence on August 23-24, 2004, addressing the assertion that the settlement offer amounted to extortion (Plt. Exs. 5, 6).

C. Wells.

Wells' testimony at the hearing was similar to that provided by Borucke and Rodio.  Wells said he has been the Sheriff of Manatee County for the past twenty years and was elected in November 2004 for another four

year term (Doc. 210, pp. 110, 111).  In the summer of 2004, he was involved in a campaign to be re-elected as Sheriff.  His campaign received a lot of publicity and this lawsuit surfaced many times throughout it (id. at p. 112).

Wells stated that his attorney, McGuire, immediately called him after she received Huffman's letter of August 17, 2004 (id. at p. 116).  He was disturbed by the letter because the letter indicated to him that Del Fuoco knew something bad about him, his family or the Sheriff's office (id. at p. 117).  Therefore, he believed he was going to be embarrassed by whatever Del Fuoco allegedly knew about him (id.).  Consequently, he wanted to meet with Del Fuoco and Huffman.

He confirmed that, at the meeting, Huffman did not speak long, but just for approximately a minute or two (id. at p. 122).  Del Fuoco spoke for a longer period of time, somewhere between eight and fifteen minutes (id.).  Wells remembers Del Fuoco stating that he had been a prosecutor for twenty years, that he is good at connecting the dots, and that he had conducted an investigation (id. at p. 123).  Moreover, Del Fuoco could develop a probable cause case that Wells had committed FEC violations (id.).  When Del Fuoco said he knew "Benny," he then pointed to Wells and said, "you

know Benny"[3] (id.).  However, Wells testified that he did not know what Del

Fuoco was talking about (id.).

Del Fuoco then accused Wells of accepting illegal campaign

funds and said he (Del Fuoco) was duty bound to report it to the FEC.  Wells,

like Borucke and Rodio,  heard Del Fuoco say he would take $500,000 and

then he and Huffman will go away.  According to Wells, Del Fuoco said, "we

just go away and this is confidential and we never bother you again" (id. at p.

125).  He too saw Del Fuoco push the FEC complaint toward McGuire and

himself (id. at p. 128).   During this time, Hufffman remained quiet and did

not disagree with Del Fuoco (id. at pp. 126, 127).

Wells testified that he was alarmed at these allegations because

Del Fuoco is an attorney with the United States Attorney's office (id. at p.

125).  He said he felt that he was being blackmailed (id. at p. 131).  He

explained he wanted to give his answer at that moment, which was "no,"

because he did not want to commit Manatee County's money to pay Del

Fuoco.  Wells said that, even if his campaign had made a mistake, he would

not pay Manatee County funds from his budget for that mistake (id. at pp.

---

[3]Sheriff Wells testified that he had met Benny Klepach one time in relation to the
formation of a local crime commission (Doc. 210, pp. 134-135) .  In an unrelated matter,
Klepach was purportedly given special deputy status after he had made a donation to
Manatee County's marine unit (id. at pp. 136, 138).

131-32).  Moreover, while he did not believe the allegations to be true, he was concerned because he did not personally handle any of the campaign's funds (his wife did), and sometimes mistakes happen and he is ultimately responsible for those mistakes (id. at pp. 132, 133).

     D.  <u>Del Fuoco</u>.

Del Fuoco was the final witness to testify.  He stated he was then employed as an AUSA for the Middle District of Florida in the civil division (Doc. 210, p. 153).  He previously was in the special prosecutions division (id.).

Del Fuoco testified that, during the pendency of this lawsuit, he was informed by a sergeant from Manatee County of illegal conduct by the Sheriff and that Del Fuoco, his ex-wife and son were potentially in danger (id. at pp. 156-57).  He explained that he conducted a private investigation and Huffman did not take part in it (id. at p. 162).  Thus, he said that, one Saturday night, he performed a Google search on the internet and discovered the alleged illegal campaign donations (id. at p. 163). Del Fuoco stated that, during the search, he found a campaign finance report for Wells which listed the names of people who had contributed money to the campaign. Del Fuoco asserted that he had uncovered that a person by the name of Benny Klepach

had made ten donations (which were beyond the legal limit) to Wells' campaign through shell corporations that Klepach controls (id.).

Consequently, Del Fuoco felt he needed to have a meeting with Wells in order to inform him of the illegal activity (id. at p. 168). Moreover, he said that Judge Merryday had admonished the parties to settle the case (id. at pp. 167-68, 184). Therefore, he wanted to settle the case.

Del Fuoco explained that Florida has a self-reporting provision which allows a person to cure a campaign error, but that he was not sure how he should process the information he learned (id. at p. 164). He knew the alleged activity occurred in counties for both Florida's eleventh and twelfth judicial circuits; therefore, he made the assumption that the FEC complaint should go there (id. at pp. 173-74). However, he felt it was an administrative matter, but wanted to make Wells aware of the error so that the money could be returned (id. at p. 174). Del Fuoco explained that he prepared the FEC complaint prior to the meeting and did not know why he brought it to the meeting (id. at p. 194). Huffman did not help him prepare it, but, prior to the meeting, Del Fuoco used a notary from Huffman's office to notarize the document (id. at p. 195).

Del Fuoco testified that defendants Colman and Bahnsen were not called to the meeting because Wells was the recipient of the money (id. at p. 175).  Del Fuoco said that he wanted to settle the case because the case was getting ugly. Del Fuoco claimed that, if he wanted to extort money from Wells, he knows of other criminal activity that he could have used against Wells, rather than the alleged illegal campaign contributions (id. at p. 166). Del Fuoco acknowledged that self-reporting was not discussed at the meeting, but was discussed later with Huffman (id. at p. 170).

Del Fuoco stated that the meeting only lasted for about seven and a half minutes and that he wanted to leave.  From his point of view, the meeting was getting ugly and he thought there might be some type of physical altercation (id. at p. 175). He claimed that, at one point, Wells, who was armed, got up from his chair and made a move towards him (id. at p. 169).  He also felt the meeting was being turned around against him and Huffman (id. at p. 177).

However, Del Fuoco testified that he did not remember the meeting verbatim (id. at p. 172).  He said that he did not mention his status as an AUSA, but did say he was a prosecutor (id. at pp. 189-90).  Del Fuoco stated that he never said he was going to file a criminal complaint (id. at p.

185).  Del Fuoco explained that, during Rodio's inquiry, he answered "no, ...

that's not what [is] going on" (id. at p. 177).

Del Fuoco could not remember certain details about the meeting.

When asked if he mentioned $500,00, plus an attorney's fee, he responded

that he did not know if he said that (id. at p. 185).  He testified that he may

have mentioned the figure in relation to the prior mediation (id. at p. 192).  He

also did not remember, or recall, making the following statements, but he did

not deny making them either: He was "duty bound to report any violations of

campaign law that [he] discovered in [his] private investigation (id. at p. 191);

"if Sheriff Wells would pay [him] $500,000, plus attorney's fee, the whole

matter would go away" (id); and "no one else except [him] knows about these

violations" (id. at pp. 193, 194).  He similarly did not recall making the

statement that, if payment was not received by 5:01 p.m. that day, he was

going to file a complaint with the FEC (id. at p. 193).

Del Fuoco explained that he did not file a complaint with the

FEC after the meeting because he was afraid that it would be spun against him

and Huffman (id. at pp. 177, 178, 180).  However, after a bar complaint was

filed against Huffman by Wells, he did not want to be bullied and, therefore,

he filed the complaint in September 2004 (id. at pp. 178-79, 194).  He said the

filing was not done in retaliation for the filed bar complaint (<u>id</u>. at pp. 194, 198).

Del Fuoco testified that he dismissed Wells from the case even though Wells did not pay him anything (<u>id</u>. at pp. 198-99). Del Fuoco said he dismissed Wells because Wells was not actively involved in the alleged running of the license tags and he felt that Wells was more of a pain than he was worth (<u>id</u>. at p. 199).

E. <u>Findings</u>.

In my view, there is no meaningful dispute about what Del Fuoco said at the meeting. The testimony of Borucke, Rodio and Wells was generally consistent concerning the essence of Del Fuoco's statements, although there were some (typical) discrepancies concerning details, such as the length of the meeting. The testimony of the three witnesses is corroborated, moreover, by the proposed FEC complaint that Del Fuoco provided. Accordingly, I accept as true and accurate the testimony of these three witnesses regarding the principal points of Del Fuoco's statements. Del Fuoco, on the other hand, claimed that he could not remember even the high points of his statements. In particular, I find it incredible that Del Fuoco could not remember whether less than a year before he made a demand of

$500,000, plus an attorney's fee, especially since there is no evidence that other amounts were discussed at the meeting.

Consequently, I find that, at the meeting, Del Fuoco stated, in essence, that he had discovered that the Sheriff had engaged in illegal campaign activity and that, if the Sheriff paid $500,000, plus an attorney's fee, to settle this lawsuit, Del Fuoco would go away and not report the matter, but that, if the Sheriff did not agree that day to such a payment, Del Fuoco would file a complaint with the FEC.  While at the meeting Del Fuoco did say that he had discovered that the Sheriff had engaged in criminal activity, I find further that it was clarified in the course of the meeting that what Del Fuoco threatened to file was an administrative complaint, and not a criminal complaint or report.

To the extent that Del Fuoco testified that his intent, at least partly, in raising the alleged campaign violations was to permit the Sheriff to self-report his own violations (id. at p. 183), that testimony is rejected as incredible.  There was no mention at the meeting of self-reporting.  Further, Del Fuoco's suggestion that the meeting was so short that he did not have the time to raise the matter of self-reporting is dismissed as implausible.[4]  The

---

[4]Del Fuoco indicates that he cut the meeting short because he was afraid that Wells would engage in a physical confrontation.  Any such concern would not be reasonable

meeting most likely lasted about twenty to twenty-five minutes, as Rodio stated, and, in all events, continued for a sufficient time to permit Del Fuoco to state his position fully. Consequently, Del Fuoco's failure to mention self-reporting at the meeting refutes Del Fuoco's testimony that he had an intent merely to allow Wells to self-report campaign violations.

Moreover, it is implausible to think that Del Fuoco would give Wells a chance to self-report any illegal conduct in light of the animosity between the two. The idea of self-reporting is also contradicted by the FEC complaint that Del Fuoco had prepared listing himself as complainant.

In short, the claim regarding self-reporting is simply a post hoc rationalization devised by Del Fuoco and Huffman in an effort to ameliorate the consequences of their conduct. And it was not a very good one at that, since it fails to account for the deadline of 5:01 (or 5:10) p.m. that day.

In addition, I find that Del Fuoco and Huffman did not seek the meeting for the purpose of obtaining a legitimate settlement of this lawsuit. The letter of August 17 asking for a meeting referred to "other matters which will become issues for your client if settlement can not be reached" (Wells Ex.

---

because the circumstances fail to reflect that Wells was prepared to resort to violence. After all, Wells had sufficient self-control not to respond immediately to an offer that he considered blackmail when instructed to wait by his lawyer.

1), and Wells and his lawyer understood this to mean that Del Fuoco had information about Wells, his family or his office that would be embarrassing (Doc. 210, p. 117-18). Furthermore, if settlement of the case were the object, the lawyers for Colman and Bahnsen (and probably the clients) should have been included, especially Colman's counsel, since he is the only defendant named in count II.

Moreover, I find that the settlement demand of $500,000, plus an attorney's fee, was not legitimate and made in good faith because it grossly exceeded the reasonable settlement value of the case. Motions by Colman and Bahnsen for summary judgment were argued just three days after the evidentiary hearing, and they revealed that the plaintiff's claims have little merit and that the plaintiff had not suffered any substantial injury. Significantly, the conspiracy claim against Wells, which was the only claim against him, was dismissed shortly after the meeting in the face of a Rule 11 motion. Arguably, however, the claim against Wells had some settlement value at the time of the meeting. But it didn't have much.

Furthermore, at the summary judgment hearing, the plaintiff argued that he did not have to show injury on the conspiracy claim and, correspondingly, he was seeking nominal and punitive damages. Under the

facts of this case and in light of <u>State Farm Mutual Automobile Ins. Co.</u> v.

<u>Campbell</u>, 538 U.S. 408 (2003), the plaintiff could not reasonably expect to

recover an amount even remotely approaching $500,000.

Therefore, I find that the demand of $500,000, plus an attorney's

fee, was not a good faith effort to compromise the plaintiff's claim against

Wells in this case.  Rather, I find that the demand was made in bad faith in an

effort to coerce Wells into settling for $500,000, plus an attorney's fee, a

claim with only a modest settlement value at best by threatening to disclose

alleged campaign violations – matters wholly unrelated to the lawsuit – at a

time when Wells was involved in a re-election campaign.

In addition, I find that Del Fuoco, in response to the motion for

sanctions, submitted an affidavit about the meeting that he knew was false in

material respects.[5]  In the first place, it was clearly misleading to state that the

meeting was arranged for the purpose of addressing settlement possibilities

(Doc. 146-2, p. 2); there was no discussion of the underlying lawsuit, and its

settlement depended entirely upon the Sheriff paying $500,000, plus an

---

[5]The affidavit was not properly filed.  It was submitted electronically with a motion for leave to file (Doc. 146).  However, Huffman used the wrong code so that on the docket the matter was listed as a reply and not a motion (<u>id</u>.).  Nevertheless, the affidavit was served on Wells' counsel, as well as on the attorneys for the other defendants.  Importantly, the affidavit is contained in the record (Doc. 146-2).

attorney's fee, in order to have Del Fuoco remain silent about alleged campaign violations.

Further, it was false to say that Del Fuoco's "intent was to give WELLS an 'out' by self-reporting the contributions to state officials and by otherwise 'making right' what appeared to [Del Fuoco] to be illegal conduct" (id. at p. 3).  As previously explained, I find that Del Fuoco did not have any intent to prompt Wells to self-report campaign violations.

It is also false to assert that "the allegations that WELLS' lawyers have made concerning this issue ... are pure fiction" (id.).  An evidentiary hearing has been conducted and those allegations have been proven to be true.

III.

Wells seeks sanctions against Del Fuoco and Huffman based upon this court's inherent authority.  A court has inherent power to impose sanctions when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.  Chambers v. Nasco, Inc., 501 U.S. 32, 45-46 (1991).  The court's "inherent power extends to a full range of litigation abuses."  Id. at 46. This power is to "be exercised with restraint and discretion."   Id. at 44. Nevertheless, "[a] primary aspect of that discretion is the ability to fashion an

appropriate sanction for conduct which abuses the judicial process." Id. at 44-45.

Sanctions may be entered against an individual attorney or a party. In re Mroz v. Mroz, 65 F.3d 1567, 1576 (11th Cir. 1995).  However, in order to impose sanctions under a court's inherent power, it must be determined that the attorney or party acted in bad faith.  Chambers v. Nasco, Inc., supra, 501 U.S. at 50.  Also, such a determination must satisfy due process, which requires fair notice of the conduct complained of, and the opportunity to explain the conduct. In re Mroz v. Mroz, supra, 65 F.3d at 1575-76.

After a court has afforded due process and determined that the accused party acted in bad faith, reasonable and appropriate sanctions are warranted.  Malautea v. Suzui Motor Company, LTD., 987 F.2d 1536, 1545 (11th Cir. 1993), cert. denied, 510 U.S. 863 (1993).  An appropriate sanction may be an award of attorneys' fees.  Chambers v. Nasco, Inc., supra.  While outright dismissal is a particularly severe sanction, it is within the court's discretion.  Id. at 45.

After an evidentiary hearing, which clearly satisfied the requirements of due process, Del Fuoco has been found to have acted in bad

faith when he made the settlement demand of $500,000, plus an attorney's fee, since the demand was predicated upon the threat to disclose alleged campaign finance violations.  The use of this case as a vehicle for the bad faith demand clearly constitutes a litigation abuse defiling the judicial process. Moreover, at the hearing, Del Fuoco sought to vindicate his demand by stating that Judge Merryday had admonished the parties to settle the case (Doc. 210, pp. 167-68).  That attempt to justify the bad faith demand demeans Judge Merryday's proper advice to the parties to resolve this case between themselves.  Consequently, Del Fuoco's bad faith conduct at the August 20 meeting plainly warrants sanctions pursuant to this court's inherent power. See  Drayton v. The Associates, 2000 WL 49189 (N.D. Tex. 2000) (plaintiff acted in bad faith when she demanded a $150,000 settlement in exchange for not distributing a defamatory flyer about the defendants); see also Cooper v. Austin, 750 So.2d 711  (Fla. App. 2000) (wife's threat that husband would go to jail if he did not agree to the mediation agreement was extortionate); Berger v. Berger, 466 So.2d 1149 (Fla. App. 1985) (husband did not have right to obtain settlement from wife by threatening that he would report her and her business partners to the IRS); Paris v. Paris, 412 So.2d 952 (Fla. App. 1982)

(settlement overturned when procured by husband's threat to expose wife's secrets).

Similarly, sanctions should be imposed upon Huffman. While Del Fuoco was the primary actor in making the bad faith settlement demand, Huffman was an active participant at the meeting. Further, he made the request for the meeting, and engaged in post-meeting communications. Moreover, he was prepared to accept spoils of the settlement demand, since he would be the recipient of the attorney's fee. While Huffman arguably had a lesser role than Del Fuoco, that would not exonerate Huffman from sanctions, but would, at most, support a contention that sanctions against him should be less than those imposed on Del Fuoco.

The conclusion that sanctions under the court's inherent power are warranted in this case is buttressed by the submission of Del Fuoco's affidavit of December 29, 2004 (Doc. 146-2). As previously stated, I find that affidavit to be false or misleading in material respects. While, as noted (fn. 5), the affidavit was not properly filed, it was submitted to the court and served upon the Sheriff's counsel. These actions bring the affidavit well within the category of litigation abuse. Therefore, the submission and service of the affidavit provide additional support for the determination that sanctions

should be imposed on Del Fuoco and Huffman pursuant to the court's inherent power.

The sanction requested by Wells is an award of attorneys' fees and costs from the date of the filing of the second amended complaint. Such an award is clearly a permissible, if not the primary, sanction under the court's inherent power for bad faith conduct. Chambers v. Nasco, supra, 501 U.S. at 55. It is axiomatic that any such award must be reasonable. See Donaldson v. Clark, 819 F.2d 1551, 1557 n.6 (11th Cir. 1987) (en banc). Moreover, a sanction under the court's inherent power must take into consideration the sanctioned party's financial circumstances. Martin v. Automobili Lamborghini Exclusive, Inc., 307 F.3d 1332, 1337 (11th Cir. 2002).

In this case, Wells' most recent estimate of his attorneys' fees was approximately $167,000 (Doc. 210, p. 205). A claim in that amount would certainly necessitate further proceedings to determine an appropriate award. Consequently, Wells' motion for sanctions (Doc. 99) is granted to the extent that he will be awarded against Del Fuoco and Huffman reasonable attorneys' fees and expenses incurred from the time of the filing of the second amended complaint, subject to a consideration of their financial circumstances and any claim by Huffman of lesser culpability.

Defendants Bahnsen and Colman have been permitted to adopt Wells' motion for sanctions (Doc. 157).  In their motions, each requests the sanction of dismissal (Docs. 125, 130).  That renders the motions potentially dispositive and thus appropriate for a report and recommendation. Accordingly, to the extent the motion for sanctions was adopted by Bahnsen and Colman, it will be addressed in the report and recommendation concerning their motions for summary judgment.

IV.

Del Fuoco has also filed a motion seeking sanctions, which, in the alternative, moves for court intervention (Doc 147).  This motion is based on a letter dated December 31, 2004, that Rodio sent to Huffman.  Del Fuoco claims that Rodio attempted to interfere with his attorney-client relationship by threatening ethical and Florida Bar actions unless Huffman withdrew from his representation of Del Fuoco.

On December 29, 2004, Huffman served (and improperly filed, see fn. 5, supra) a motion requesting permission for Del Fuoco to file his affidavit (Doc. 146).  Rodio responded to Huffman with a letter dated December 31, 2004, that stated in part (Plt. Ex. 24):

> Del Fuoco has decided to use a false affidavit
> to extricate himself from the *Motion for Sanctions*.

That strategy will not succeed because Del Fuoco's affidavit is demonstrably false.  Please review, for example, your own correspondence of August 17, 20, and 23.  That correspondence, and other record evidence, squarely contradicts Del Fuoco's affidavit. [footnote omitted] In fact, Del Fuoco's account of the August 20 meeting is in stark contrast to the response filed under your signature and your affidavit. [footnote omitted]

Respectfully, you have an ethical obligation to promptly file a motion to withdraw from your representation of Del Fuoco.  *See* R. Regulating Fla. Bar 4-1.2(d); 4-1.16(a)(1); 4-3.3(a)(2).  Furthermore, your prompt filing of a such a motion is not only mandatory, but may serve to limit your exposure in these proceedings.  As it stands, the evidence shows that Del Fuoco was the principal actor in the extortionate conduct that occurred on August 20.  Moreover, we note that the response filed under your signature and your affidavit do <u>not</u> contain the misrepresentations now set forth in Del Fuoco's affidavit.  Your prompt withdrawal from the case, we believe, would indicate that Del Fuoco's decision to file a false affidavit was his alone.

Please accept this letter in the spirit in which it was intended - we ask you to remember your ethical obligations and act promptly.

This letter, contrary to the plaintiff's motion, does not provide a basis for sanctions.

In the first place, the motion is procedurally deficient.  As the Sheriff points out, the plaintiff cites no authority in his memorandum in support of a request for sanctions.  Indeed, the plaintiff does not even identify

a recognized ground for sanctions as a basis for his motion.  The failure to cite any legal authority in support of the motion is a violation of Local Rule 3.01(a).  That failure alone is a sufficient reason to deny the motion.[6]

Furthermore, the December 31 letter does not warrant the imposition of sanctions.  As previously explained, I have found that the affidavit by Del Fuoco that was the subject of the letter was false in material respects.  Since Huffman was a participant in the meeting that was the focus of that affidavit, he plainly knew that the affidavit was false or misleading.  Consequently, as the Sheriff points out, there would have been a good faith basis for seeking Huffman's disqualification (Doc. 150, pp. 11-13).  That being so, sanctions are not justified for Rodio having taken the lesser step of warning Huffman about the problem.[7]

---

[6]Notably, on September 9, 2004, Judge Merryday entered an Order that pointed to Huffman's repeated violations of the Local Rules and other rules and warnings, and cautioned that any further violation "may result in a fine of at least $500 ..., reference to the Middle District's grievance committee, or other judicial sanction" (Doc. 91).  As the plaintiff's motion shows, Judge Merryday's warning did not cure Huffman's "insouciance" (id.).  Nevertheless, in light of the ruling on the Sheriff's motion for sanctions, the denial of this motion on procedural grounds is sanction enough.

[7]At the evidentiary hearing, I noted that it seemed to me that Huffman had a potential conflict of interest with respect to the Sheriff's motion for sanctions.  Thus, Del Fuoco was the main actor, so that Huffman could reasonably argue that his liability for attorneys' fees should be less than Del Fuoco's.  If Huffman continues to represent both himself and Del Fuoco on the motion for sanctions, it will be awkward and difficult, at best, for him to make such an argument.

For these reasons, the plaintiff's motion for sanctions, or, in the alternative, for court intervention, will be denied.

It is, therefore, upon consideration

ORDERED:

1.  That the Sheriff Wells' Motion for Sanctions Against Jeffrey Del Fuoco and Plaintiff's Attorney Craig Huffman for Bad Faith and Extortionate Conduct (Doc. 99) is hereby **GRANTED**.

2.  That the plaintiff's Motion for Sanctions or in the Alternative Motion for Court Intervention to Prevent Further Actions by Defendant tor [sic] His Counsel (Doc. 147) is hereby **DENIED.**

DONE and ORDERED at Tampa, Florida, this 20th day of September, 2005.

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE