UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JEFFREY J. DEL FUOCO,

        Plaintiff,

v.                              CASE No. 8:03-CV-161-T-23TGW

LARRY BAHNSEN, individually,
and BARRY COLMAN,
individually,

        Defendants.

_____

<u>REPORT AND RECOMMENDATION</u>

        The plaintiff, Jeffrey J. Del Fuoco, alleges that in violation of 42 U.S.C. 1985(1) defendants Larry Bahnsen and Barry Colman, who are Manatee County deputy sheriffs, conspired to prevent him from performing his duties as an Assistant United States Attorney ("AUSA"), and conspired to injure him in his person and property on account of his lawful discharge of his duties or to impede the discharge of his duties. This claim fails on several levels. A fundamental deficiency is that the plaintiff has not adduced any evidence that the alleged conspiracy to prevent him from performing his duties involved force, intimidation or threat, as proscribed by the statute, or

that the alleged conspiracy involved injury to his person or property. Furthermore, contrary to the plaintiff's belief, a claim under §1985 does require the showing of injury, and the plaintiff has acknowledged that he has not sustained any legally cognizable injury.

The plaintiff also alleges that defendant Colman violated the Drivers Personal Protection Act ("DPPA") by accessing personal information about the plaintiff and his former wife from a motor vehicle database. Although there is a factual question whether Colman was joking when he said he requested that inquiry, the plaintiff has failed to carry his burden to show that the inquiry was not for a purpose authorized by the Act.

The defendants have filed motions for summary judgment on the plaintiff's claims (Docs. 162, 164).   For the reasons stated below, I recommend that those motions be granted.

In addition, the defendants have adopted a motion for sanctions against the plaintiff for bad faith conduct.  I have previously found that the plaintiff engaged in bad faith conduct by seeking a settlement of this case for $500,000, plus attorney's fees, in return for remaining silent about alleged campaign finance violations by Manatee County Sheriff Charles Wells.  This

conduct provides, under this court's inherent power, an alternative basis for dismissal of this lawsuit.

## I.

From January 1995 until May 2003, the plaintiff was an AUSA in the criminal division of the United States Attorney's Office for the Middle District of Florida. The defendants are deputy sheriffs in the Manatee County Sheriff's Office ("MCSO"), and were members of the MCSO's special investigations division, narcotics unit, formerly known as the "Delta" squad. From August 1998 through June 4, 2001, the plaintiff was the lead prosecuting AUSA in the investigation, and successful prosecution, of six members of the MCSO's Delta squad for public corruption. The defendants were not implicated in that investigation.

On January 31, 2003, the plaintiff filed a civil lawsuit against Charles B. Wells, who is the Sheriff of Manatee County, a John Doe deputy from Manatee County, and Lola Foy, an employee of the Manatee County Sheriff's Office (Doc. 1). The complaint alleged that the John Doe deputy caused Foy improperly to run Del Fuoco's and his wife's license numbers and vehicle tags through the Florida Department of Highway Safety and Motor

Vehicles ("DMV") database in violation of 18 U.S.C. 2721 et. seq. The information obtained from this search included the plaintiff's home address, and the plaintiff alleged that it was obtained with the "purpose and intent to harm, injure, harrass [sic], and invade [his] privacy ... as retaliation against him[,] for the successful investigation and prosecution" of the MCSO Delta members (Doc. 1, ¶13). On July 7, 2003, Del Fuoco amended his complaint and identified deputy Barry Colman as the one who asked Foy to access the information (Doc. 21, ¶24). All three defendants filed motions to dismiss (Docs. 23, 24, 46). On June 14, 2004, United States District Judge Steven D. Merryday granted Foy's and the Sheriff's motions to dismiss with leave for Del Fuoco to file a second amended complaint (Doc. 74). In this connection, Judge Merryday ruled that there were no facts to support the conclusion that Foy knew of any intention to use the information acquired from the DMV database search for an unlawful purpose, and that Wells could not be held vicariously liable for that act.

On July 30, 2004, Del Fuoco filed a second amended complaint (Doc. 80). Foy was not named in the complaint. Rather, Del Fuoco sued Sheriff Wells and deputies Larry Bahnsen and Barry Colman. In addition to

his previous allegation that Colman violated the DPPA, the plaintiff added a claim that defendants Wells, Colman and Bahnsen conspired to impede his ability to investigate and uncover illegal activities by the Sheriff and his office, in violation of 42 U.S.C. 1985(1).  On August 17, 2004, Wells filed a motion to dismiss the second amended complaint (Doc. 83).[1]  Also, Wells on August 20, 2004, served plaintiff's attorney, Craig Huffman, with a Rule 11, F.R.Civ.P., motion for sanctions for filing a meritless second amended complaint.  On September 9, 2004, within the twenty-one day safe harbor period provided by Rule 11, Del Fuoco voluntarily dismissed Wells from the case (Doc. 95).

Thereafter, on September 23, 2004, Wells filed a motion for sanctions against Del Fuoco and Huffman for filing a meritless lawsuit against Wells with the intention to publicly harass him during his political campaign for Sheriff in 2004 (Doc. 99).  The motion also alleged that Del Fuoco's and Huffman's conduct at a settlement meeting amounted to extortion, and that Huffman violated the Florida Rules of Professional Conduct because he and Del Fuoco demanded a sum of money based upon allegations wholly

---

[1]Colman and Bahnsen also filed motions to dismiss the second amended complaint (see Docs. 84, 96).  Those motions were subsequently denied as moot because the plaintiff sought leave to file a third amended complaint (Doc. 101).

unrelated to the pending civil case.  In that motion, Wells requested the court, based on its inherent authority, to impose sanctions upon Huffman and Del Fuoco, including an award of attorneys' fees and costs.

On September 29, 2004, an order was entered dismissing Wells from the case (Doc. 100) based upon the plaintiff's voluntary dismissal of Wells as a party.

On October 25, 2004, Del Fuoco filed his third amended complaint against Bahnsen and Colman, alleging again a conspiracy "to prevent, by force, intimidation and threat, the Plaintiff from discharging his duties as an Assistant United States Attorney ... and to injure the Plaintiff in his person and property on account of the lawful discharge of the duties of his office"(Doc. 118, ¶13).   The second count of the complaint alleges that Colman illegally obtained, in violation of the DPPA, the plaintiff's personal information in order to conduct surveillance on his home to further the conspiracy's goal of retaliation. Although Wells and Foy were dismissed from the case, the plaintiff maintains that they are co-conspirators.

In November 2004, Bahnsen and Colman filed motions to adopt Wells' motion for sanctions, and each sought dismissal of the case (Docs. 125, 130).   The motions to adopt were granted (Doc. 157).

The motions for sanctions by the Sheriff and the defendants were referred to me for disposition (Docs. 110, 131).  An evidentiary hearing was held on these motions (Docs.  205, 210).  An order was subsequently entered granting the Sheriff's request for an award of reasonable attorneys' fees resulting from the filing of the second amended complaint because the evidence established that the plaintiff and his attorney, in bad faith, sought to obtain a settlement of this case for $500,000, plus an attorney's fee, in exchange for not disclosing alleged campaign violations by the Sheriff (Doc. 224).

In the meantime, both defendants filed motions for summary judgment with respect to the third amended complaint (Docs. 162, 164).  They argue that there is insufficient evidence from which a jury could reasonably conclude that there was a conspiracy or that the defendants were involved in it.  Furthermore, they allege that the conspiracy claim is not actionable because the plaintiff has not suffered any damage.  Colman also seeks summary judgment on the plaintiff's claim that he violated the DPPA, asserting that he did not direct anyone to access any computer database in order to obtain the plaintiff's personal information.

The motions were referred to me for a Report and Recommendation (Doc. 187). They were subsequently the subject of oral argument (Doc. 207).

## II.

The court shall enter summary judgment only if the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." F.R.Civ.P. 56( c). Material facts are those over which disputes "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Disputes about material facts are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The movant bears the burden of establishing the absence of a dispute over material facts. Reynolds v. Bridgestone/Firestone, Inc., 989 F.2d 465, 469 (11th Cir. 1993).

Where the party opposing the summary judgment motion has the burden of proof at trial, the moving party may discharge its initial burden by identifying specific portions of the record which show the absence of evidence to prove the nonmoving party's case at trial. United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437-38 (11th Cir. 1991). Alternatively, the

movant may come forward with "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." Id. at 1438. If the moving party does not meet its burden, then the motion for summary judgment will be denied.  Id. at 1437.

Where the moving party meets its initial burden, the burden then shifts "to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  If the party opposing the motion is unable to make a sufficient showing on an element essential to its case on which it has the burden of proof at trial, the movant is entitled to summary judgment. United States v. Four Parcels of Real Property, supra, 941 F.2d at 1438.

In determining whether the moving party should be awarded summary judgment, the court must view the evidence and factual inferences therefrom in the light most favorable to the opposing party.  Reynolds v. Bridgestone/Firestone, Inc., supra, 989 F.2d at 469.  Any reasonable doubts about the facts are to be resolved  in favor of the party opposing  the motion for summary judgment.  Id.

III.

The plaintiff alleges in the third amended complaint that the defendants, in violation of 42 U.S.C. 1985(1), conspired to prevent him from carrying out his duties as an AUSA regarding his investigation of public corruption by the MCSO's Delta squad and conspired to injure him in his person or property on account of the discharge of his duties or to impede the discharge of his duties.

42 U.S.C. 1985 pertinently provides as follows:

(1) If two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or to induce by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties;

. . .

(3) ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or

-10-

> deprived may have an action for the recovery of
> damages occasioned by such injury or deprivation,
> against any one or more of the conspirators.

A civil conspiracy  "is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another and an overt act that results in damage." Lenard v. Argento, 699 F.2d 874, 882-83 (7th Cir. 1983), cert. denied, 464 U.S. 815 (1983).  While an express agreement among all the conspirators is not a necessary element  of a civil conspiracy, the participants in the conspiracy must share the general conspiratorial objective, but they need not know all the details of the plan designed to achieve the objective or possess the same motives for desiring the intended result.  Id.  However, in order to establish the existence of a conspiracy under §1985, there must be "sufficient evidence that would permit a reasonable jury to conclude that a meeting of the minds had occurred and that the parties had an understanding to achieve the conspiracy's objectives." Hernandez v. Joliet Police Dept., 197 F.3d 256, 263 (7th Cir. 1999); see also Webb v. Goord,  340 F.3d 105, 110 (2nd Cir. 2003), cert. denied, 540 U.S. 1110 (2004).

The plaintiff attempts to find a conspiracy involving the defendants in three distinct incidents, or series of incidents, that took place from December 1998 to September 2002 (although the plaintiff does not always stick with the same three incidents (see fn. 3, infra)).  Thus, the plaintiff alleges that the purported conspiracy is evidenced by (1) telephone calls from Bahnsen and the Sheriff to the plaintiff in December 1998 and January 1999, coupled with a letter to United States District Judge Elizabeth A. Kovachevich; (2) a motor vehicle database search by Foy in June 2001; and (3) physical surveillance of the plaintiff's home in September 2002  (see Doc. 118, p. 6).  The separation in time of these events raises serious doubts whether there was a conspiracy to do anything.  In all events, they do not evidence a conspiracy that is covered by §1985.

The plaintiff asserts that there was a conspiracy to prevent him from discharging his duties.  However, the plaintiff in his summary judgment memorandum ignores, or overlooks, that §1985 proscribes a conspiracy "to prevent, by force, intimidation, or threat, any person ... from discharging any duties" as an officer of the United States.  None of the alleged overt acts show a conspiracy to prevent by force, intimidation, or threat the plaintiff from carrying out his duties as an AUSA.

The plaintiff alleges that the earliest act in furtherance of the conspiracy to interfere with the discharge of his duties occurred in December 1998 (Doc. 118, ¶13).  During this time, the Sheriff had received information from MCSO Sergeant Chris Atkinson about the possible disclosure of secret grand jury testimony by Florida Department of Law Enforcement ("FDLE") special agent Mark Flint, an investigator on the Delta matter, and sought to convey this concern to the plaintiff (see Doc. 168, ¶6).  Wells was not familiar with the plaintiff, so Bahnsen, who had worked with the plaintiff previously, called the plaintiff to inform him of this information (see Doc. 164, Ex. 1, pp. 60-62).  The plaintiff, however, refused to talk with Bahnsen.  Wells then decided to write a letter to then-Chief Judge Kovachevich about the allegations and to request an investigation.[2]  Wells subsequently called the

---

[2]That letter, dated December 28, 1998, states, in part (Doc. 168, Att. 1):

"The complaint I wish to file[] is that S/A [Flint] has disclosed actual and potential testimony that is now under consideration by the Grand Jury. Testimony he has disclosed is supposed to be secret.
....
S/A [Flint] has disclosed this sensitive information ... to [name blacked out].... Officer [name blacked out] then disclosed the same information to Sergeant Chris Atkinson of the Manatee County Sheriff's Office (see attached Atkinson memo).
....
I am requesting that an investigation be conducted regarding S/A [Flint's] disclosure of Grand Jury  testimony."

plaintiff "to discuss [his] letter [to Judge Kovachevich] and concern about the potential grand jury secrecy violation" (Doc. 168, ¶7).[3]

The plaintiff contends that Bahnsen telephoned him  (Doc. 118, ¶20):

> ... in order to discuss Plaintiff's investigation of corruption and misconduct within the MCSO, to discover "what" the Plaintiff had uncovered to date concerning such activity, and to in [sic] order [sic] to falsely and fraudulently assert misconduct on the part of a member of Plaintiff's investigative team, all with the purpose ... of impeding Plaintiff's efforts at discharging the duties of his office.

Beside the fact that the plaintiff never spoke with Bahnsen ( Doc. 164, Ex. 4, pp. 36-37, 41), and therefore had no personal knowledge as to the purpose of Bahnsen's telephone call, the plaintiff clearly does not point to any evidence indicating that the telephone call involved "force, intimidation, or threat." Consequently, there is nothing about that telephone call that would support a claim for relief under §1985(1).

---

[3]The plaintiff set forth in the third amended complaint Bahnsen's attempted telephone call as an overt act, but did not allege Wells' efforts.  In contrast, the Bahnsen telephone call was not mentioned in the summary judgment memorandum, although Wells' efforts were.  Seemingly, the plaintiff cannot rely upon either, since the Bahnsen telephone call is abandoned as an overt act, and Wells' actions were not properly alleged.

The plaintiff similarly attributes a sinister motive to Wells' telephone call to the plaintiff on January 19, 1999, alleging that Wells had concocted the allegations about Flint disclosing secret grand jury information in order to obstruct the plaintiff's investigation (Doc. 186, pp. 5-7). The plaintiff, however, has not proffered any evidence to substantiate this accusation. Regardless, this call also is devoid of any evidence that would support a finding that the defendants conspired "by force, intimidation, or threat" to prevent the plaintiff from discharging his official duties. Accordingly, neither Wells' telephone call to Del Fuoco nor his letter to Judge Kovachevich provides any basis for relief under §1985(1).[4]

Therefore, the §1985(1) claim that the defendants conspired to prevent the plaintiff from performing his duties cannot be supported by the attempted telephone call by Bahnsen, or by Wells' communications, since none of those incidents evidences a conspiracy involving "force, intimidation, or threat."

---

[4]Furthermore, §1985(1) has been construed, in order not to infringe the right to petition the government, not to cover complaints about an officer's official performance lodged by the defendants with the officer's superiors. Stern v. United States Gypsum, Inc., 547 F.2d 1329, 1344 (7th Cir. 1977), cert. denied, 434 U.S. 975 (1977). The limiting construction of §1985(1) in Stern provides an additional reason why Wells' complaints about Flint's conduct do not support a claim under that provision.

Furthermore, the other two acts relied upon by the plaintiff do not support a conspiracy to prevent the plaintiff from carrying out his duties.

The next alleged act in the conspiracy took place one and one-half years later, on June 6, 2001, when, according to the plaintiff, "Colman asked Lola Foy, an MCSO employee, to conduct illegal computer database inquiries ... on the Plaintiff and certain members of his family" (Doc. 118, ¶21) (emphasis omitted). This was allegedly done "with the intent to harm, injure, harass and invade the privacy of the Plaintiff ... and the family of Plaintiff, all as retaliation against him, for the successful investigation and prosecution of six sworn law enforcement members of the [MCSO]..." (id. at ¶ 36).

Importantly, there is no allegation in the third amended complaint that the inquiries were done with the object of preventing the plaintiff from carrying out his official duties, much less that that object was achieved by force, intimidation, or threat. It is not surprising that the allegations regarding the database inquiries are not asserted in support of a conspiracy to prevent the plaintiff, by force, intimidation, or threat, from performing his duties since those inquiries were conducted surreptitiously. Because whoever directed that they be done expected that the inquiries would never be discovered, it

logically follows that they could not plausibly provide evidence of a conspiracy to prevent the plaintiff, by force, intimidation, or threat, from performing his duties.

The last act in the conspiracy alleged by the plaintiff occurred in September 2002 when his Pinellas County townhome was purportedly the subject of surveillance on at least three separate occasions. The plaintiff contends that the purpose of the surveillance was to harass and stalk him in retaliation for discharging his duties (id. at ¶18). The plaintiff, again, does not allege that the surveillance had as its object the prevention by force, intimidation, or threat of the plaintiff from performing his duties.

This activity also was intended to be carried out surreptitiously. Moreover, it would have no apparent effect upon the plaintiff's ability to perform his duties. Consequently, the alleged surveillance of the plaintiff's home, even assuming it was part of a conspiracy (and that assumption is rejected later in this Report and Recommendation), does not provide evidence of a conspiracy to prevent the plaintiff from performing his duties.

Furthermore, the plaintiff cannot show that such a conspiracy was to be effected by force, intimidation, or threat. Arguably, a person might feel intimidated by an apparent surveillance vehicle in his neighborhood,

although in this case the plaintiff was not home during the surveillance.  The issue here, however, is not whether the plaintiff was intimidated by the surveillance, but whether the defendants conspired to prevent by intimidation the plaintiff from performing his duties.  Since the surveillance was to be conducted secretly, it would be unreasonable to conclude that the defendants intended the surveillance to intimidate the plaintiff.  Conceivably, the surveillance, combined with subsequent acts directed toward the plaintiff, could provide evidence of a conspiracy to prevent by intimidation the plaintiff from performing his duties.  However, no subsequent acts have been alleged.  Consequently, evidence of the surveillance, by itself, does not support such a conspiracy.

In sum, the evidence does not support a conspiracy to prevent, by force, intimidation, or threat, the plaintiff from performing his official duties.  Thus, the telephone calls by Bahnsen and Wells and the letter to Judge Kovachevich do not reflect a conspiracy involving force, intimidation, or threat, which, under §1985(1), is an essential element of a conspiracy to prevent the performance of official duties.  Furthermore, neither the database inquiries nor the surveillance evidences a conspiracy to prevent the plaintiff from performing his duties, and the plaintiff, significantly, did not allege that

they do.  In addition, any conspiracy involving the database inquiries and the surveillance does not contemplate the use of force, intimidation, or threat. Consequently, the evidence fails to prove the primary conspiracy object alleged, which, notably, is the only one articulated in the pretrial statement as an issue of fact to be litigated (Doc. 211, p. 8).

The plaintiff also alleges in the third amended complaint that the defendants and others conspired to injure him in his person and property on account of the discharge of his duties (Doc. 118, ¶13).  This allegation appears to be something of an afterthought since neither the response to the summary judgment motions nor the pretrial statement set out the elements of such a conspiracy or specify the facts that would support it.  As indicated, the pretrial statement does not list a conspiracy to injure the plaintiff or his property as an issue of fact to be litigated (see Doc. 211, p. 8).  The plaintiff's weak presentation of this conspiracy allegation is a reflection of its lack of merit.

Section 1985(1) does create a claim for relief for subjects harmed by a conspiracy to injure them or their property on account of their official duties or to impede the performance of those duties.  Moreover, although the issue is not entirely clear, it has been held that the element of force, intimidation, or threat does not apply to a conspiracy to injure an official or

his property.  <u>Stern</u> v. <u>United States Gypsum, Inc.</u>, <u>supra</u>, 547 F.2d at 1336-37.[5]

The plaintiff, however, has not come forward with any evidence that would establish that the defendants conspired to injure him or his property.  There is no evidence of such a conspiracy in the form of admissible statements, documents, testimony or any other materials.  Consequently, the plaintiff relies upon circumstantial evidence to attempt to prove a conspiracy having the object to injure him or his property.

As indicated, the plaintiff points to three incidents, or series of incidents, to prove a conspiracy.  However, he does not allege that the attempted telephone call by Bahnsen in December 1998, and the communications by Wells in January 1999 had as their object an injury to the plaintiff or his property (<u>see</u> Doc. 118, ¶20).  But even if he had, such an allegation would be baseless.  There is nothing about Bahnsen's attempted telephone call or Wells' communications, all of which centered around complaints that Flint had violated Rule 6(e), F.R.Cr.P., that would permit a

---

[5]This issue is clouded by the unorthodox placement in the nineteenth century statute of one semicolon.  Arguably, all of the objects after the semicolon, including the objects of injuring an officer or his property, are modified by the phrase "by like means," that is, by force, intimidation, or threat.  The contrary construction of §1985(1) set out in <u>Stern</u> seems preferable.

reasonable jury to find that there was a conspiracy to injure the plaintiff or his property.

To the extent that the plaintiff alleges such a conspiracy, he attempts to predicate it on the database inquiries and the surveillance in his neighborhood.  Before evaluating whether these incidents would support a finding that the defendants conspired to injure the plaintiff or his property, it is appropriate to point out that the plaintiff's reliance on these predicates is problematic.

In the first place, the surveillance took place fifteen months after the sentencing on June 4, 2001, of the last Delta squad member and the database inquiries on June 6, 2001.  Particularly since the plaintiff asserts that the surveillance was conducted in retaliation for the Delta squad prosecutions, the principle followed in the employment retaliation context regarding the lack of an inference of causation when there is such a time gap is pertinent here.  Thus, the fifteen-month gap belies the assertion that the prosecutions caused the surveillance.  See Maniccia v. Brown, 171 F.3d 1364, 1370 (11th Cir. 1999).  Similarly, in light of the time gap, no inference should be drawn that there is a connection between the database inquiries and the surveillance.  That is especially so since the plaintiff had a change of residence in the

interim and, thus, the address turned up by the database inquiries was not an address in the neighborhood where the surveillance was conducted.

Furthermore, the evidence would not sustain a finding that the vehicle seen in the plaintiff's neighborhood in Pinellas County was owned by the MCSO.  On this point, the plaintiff has presented evidence that, during the pertinent time period, the MCSO owned a black pickup truck with a camper top and dark tinted windows, which has allegedly been identified by three neighbors as the vehicle that was seen in the plaintiff's neighborhood in September 2002 (Doc. 127, Ex. A; Doc. 173-6, Ex. O).

Neighbor Helen Arand contacted the Pinellas County Sheriff's Office about the vehicle, and was told a private investigator had called in and informed the Sheriff's Office that he would be in the subdivision (Doc. 173-4, Ex. M).  Another neighbor, Elwood Clark, stated that he saw the vehicle three or four times during a three-week period (Doc. 173-5, Ex. N).  On one occasion, he approached the vehicle in an unsuccessful attempt to write down the vehicle tag number (id.).  The driver, who would not identify himself, rolled down his window and stated that he was a private investigator (id.).  None of the neighbors obtained a vehicle tag number or a vehicle identification number from the truck (id.; Doc. 173-6, Ex. O).  However, the

MCSO owned a black pickup truck similar in appearance and three of the plaintiff's neighbors subsequently identified a photograph of the MCSO black pickup truck as the vehicle that was observed in their neighborhood (Doc. 173-6, Ex. O).[6]  In addition, the plaintiff's wife testified that a picture she was shown of the MCSO truck depicted the same vehicle she once saw in her neighborhood (Doc. 164, Ex. 7, p. 34).

The plaintiff, in short, attempts to prove that it was the MCSO truck that was in his neighborhood based upon pictures of the truck shown to the witnesses six to seven months after the surveillance.  The defendants, in response, have provided evidence that the truck seen in September 2002 in the plaintiff's neighborhood did not belong to the MCSO.  In this connection, the defendants have presented uncontroverted evidence that the license plate and the mileage on the MCSO truck prove that it could not have been the truck that the neighbors saw conducting surveillance in their neighborhood.

Thus, Bruce E. Benjamin, a  sergeant with the MCSO, reviewed the vehicle's fuel service records, charge card receipts, and conducted

---

[6]The parties have referred to several FDLE reports as exhibits to their summary judgment memoranda.  These reports would be objectionable as hearsay, if anyone had made an objection.  However, no one did.  To the contrary, each side relied on something in the reports.  In light of the lack of objection, it is appropriate to consider the information in the reports.

interviews (Doc. 164, Ex. 5).  Benjamin determined that the MCSO vehicle

had been driven a total of 98 miles between July 21, 2002, and February 3,

2003  (id. at  ¶¶ 6, 7).  The  mileage for one trip to the plaintiff's

neighborhood is nearly 100 miles (id. at ¶10).  Therefore, if the black pickup

truck conducted surveillance on at least three different dates, the vehicle

mileage would have increased more than 294 miles (id. at ¶¶ 10, 12, 13).

Consequently, this mileage disparity overwhelmingly supports the defendants'

contention that the  MCSO vehicle could not have been the black pickup truck

that the neighbors observed in September 2002.

Corroborating this conclusion is evidence that the license plate

on the surveillance vehicle in the plaintiff's neighborhood was different than

the one on the MCSO truck. Thus, neighbor Elwood Clark stated that he had

attempted to write down the tag number of the surveillance vehicle, but was

unsuccessful because the first number was obscured by a bracket (Doc. 173-5,

Ex. N).  However, Benjamin pointed out that the MCSO vehicle had a

Buccaneer's license plate (Doc. 164, Ex. 5, ¶¶ 11, 14, 15), which would not

only have been easily recognizable because of the Buccaneer flag on it, but

also because it begins with the letter "B," not a number.  Significantly, the

plaintiff has not controverted the  evidence regarding the license plate or the mileage disparity.

Other factors buttress the conclusion that the surveillance vehicle was not owned by the MCSO.  Thus, Bahnsen explains that surveillance of the plaintiff's home by the MCSO truck would not be conducted from the location where the vehicle was seen due to likelihood of detection or from the position it was facing due to the MCSO's equipment set-up (Doc. 164, Ex. 1, p. 125).  He stated further that the MCSO truck was intended for nighttime surveillance, and not surveillance during the daytime in early September, because of its inadequate air conditioning system (id. at pp. 124, 132).  In addition, surveillance of the plaintiff by an MCSO conspirator during weekdays would make no sense since, as alleged MCSO conspirators would expect, the plaintiff was at work.

The evidence, therefore, is compelling that the vehicle seen in the plaintiff's neighborhood was not the MCSO truck.   Moreover, the identification of that truck by witnesses months later after having been shown photographs is not even probative enough to raise a genuine issue of fact.

On April 28, 2003, more than seven months after the vehicle was seen in the neighborhood, three neighbors told Flint that pictures of the MCSO truck were identical to the truck they had seen (Doc. 173-6, Ex. O). Significantly, the neighbors apparently did not state that the truck in the photos was the same as the one that was seen in the neighborhood, but merely that the photos depicted a truck that was identical to the one they had seen. Notably, the MCSO vehicle was simply a 1998 black Dodge pick-up truck that had a camper top, which had been purchased locally (Doc. 164, Ex. 1, pp. 123, 126). Obviously, there could be other vehicles in the area that look like the MCSO truck.

In addition, there are other factors that would diminish any weight given to the neighbors' identification. Thus, from all that appears, the photo display of the truck was suggestive, since there is no indication that the neighbors were shown pictures of any other trucks. Further, the statements were not under oath, were not subject to cross-examination, and may not have been precisely recorded by the interviewer.

The plaintiff's wife, unlike the neighbors, testified that the photos of the MCSO vehicle were of the same truck she once saw in her

neighborhood (id. at Ex. 7, p. 34).   Carla Del Fuoco stated that, on one occasion on a date not recalled, she drove past the vehicle around the corner from her house.  At this point, she had not been made aware by the neighbors of a suspicious truck being in the neighborhood.  Moreover, when she was interviewed by an investigator on September 24, 2002, she did not mention having seen the truck (Doc. 172-2, p. 50; Doc. 173-3, Ex. L).  Nevertheless, after pictures were surreptitiously obtained of the MCSO truck and shown to her about six months later, she testified that it was the same truck that she had seen in her neighborhood.  Notwithstanding that she grew up in Texas and claims to know trucks (Doc. 164, Ex. 7, p. 25), this testimony strikes me as too incredible to be accepted by reasonable minds.  Consequently, this testimony will not prevent summary judgment.  Barker v. Norman, 651 F.2d 1107, 1127 (5th Cir. 1981); see also Agosto v. Immigration and Naturalization Service, 436 U.S. 748, 772 (1978)(dissenting opinion).

In all events, the photo identifications of the truck are, at best, a mere scintilla of evidence.  The defendants, in contrast, have presented compelling evidence regarding the MCSO truck's mileage and its license plate, as well as other factors, that establish that the vehicle seen in the

plaintiff's neighborhood was not the MCSO truck.  In the face of this showing, the scintilla of evidence presented by the plaintiff is not sufficient to permit a jury reasonably to find that the observed vehicle was owned by the MCSO.  See Anderson v. Liberty Lobby, Inc., supra, 477 U.S. at 252.

The conclusion that the vehicle seen in the plaintiff's neighborhood was not the MCSO truck virtually destroys any claim of a conspiracy to injure the plaintiff or his property.  However, even assuming that the vehicle conducting surveillance in the neighborhood was the MCSO truck, the evidence would still be too weak to support a finding that there was such a conspiracy.

As indicated, there is no admissible evidence of any type expressing an object to injure the plaintiff or his property.  An inference of such an objective cannot be drawn simply from the database inquiries on June 6, 2001, and the surveillance in September 2002.  In the absence of any act which even arguably attempted to injure the plaintiff or his property, it requires pure speculation to reach a conclusion that the defendants had such a goal.  While these two incidents may be sufficient for conspiracy theorists, they are not sufficient to permit a rational jury to find that the defendants

conspired to injure the plaintiff or his property on account of his official duties or to impede the performance of those duties.

Like the alleged conspiracy to prevent the plaintiff by force, intimidation, and threat from performing his duties, the alleged conspiracy to injure the plaintiff in his person or property has not been sufficiently supported by probative evidence. Consequently, since the plaintiff cannot sustain either alleged conspiracy, his claim under §1985(1) fails. It is appropriate to add, however, that there is a further problem with the conspiracy claim: The plaintiff has failed to show the involvement of two or more individuals.

Colman's involvement in the running of the tags is established by his own statement that he directed Foy to do that. Colman acknowledges that he made such a statement, but says that he was joking. Colleagues of his agree with that assessment. However, Joseph Bernhard, a former MCSO sergeant, testified that Colman said the same thing to him and that he was not joking when he said it. This testimony is sufficient to create an issue of fact concerning whether Colman directed Foy to make the database inquiries of the plaintiff and his former wife.

While Colman is thus implicated in the matter, the plaintiff has failed to provide probative evidence of any other conspirators, even unnamed ones.  Although Foy ran the tags, purportedly at Colman's direction, there is no evidence that she did so as a knowing member of a conspiracy against the plaintiff.  Rather, from all that appears, she was simply carrying out a request that would have been within the normal course and scope of her duties.[7]

Further, while the plaintiff has dismissed the Sheriff from the suit, he still asserts that the Sheriff is a co-conspirator.  There is no evidence supporting that assertion.  The only specific conspiratorial acts asserted (which, as noted, fn. 3, <u>supra</u>, were not alleged in the third amended complaint) relate to his communications regarding possible Rule 6(e) violations.  As previously explained, those allegations do not support a conspiracy claim for several reasons.  Frankly, the allegations of conspiracy against the Sheriff are so baseless that, if he had not been dismissed from the suit following service of a Rule 11 motion, he would have a strong argument for sanctions under that rule.

_____

[7]Although I doubt it (and it makes no difference), I could not resist noting that there is a suggestion that Foy thought she was running the tags of Joey Buttafucco (Doc. 164, Ex. 3, p. 84).

Similarly, there is no evidence tying Bahnsen into a conspiracy. While the plaintiff alleged in the third amended complaint that Bahnsen's attempted telephone call to the plaintiff in December 1998 was evidence of a conspiracy, that allegation has been previously rejected as unsupported. The plaintiff also asserts that it was Bahnsen who was conducting the surveillance in the plaintiff's neighborhood. There is no probative evidence, however, to support this assertion. Significantly, none of the neighbors could identify the occupant of the alleged surveillance vehicle, including Clark, who had seen the occupant and who was shown pictures of Bahnsen and Colman (Doc. 173-6, Ex. O). Furthermore, although the truck had been assigned to Bahnsen for use in connection with surveillance conducted by the Delta squad, as of September 2002 he had transferred to the marine unit and had turned the keys over to another individual (Doc. 164, Ex. 1, pp. 130-31).

In seeking to create a conspiracy involving Bahnsen, Colman and the Sheriff, the plaintiff relies heavily, if not exclusively, upon the testimony of former sergeant Bernhard. I have read Bernhard's entire deposition and it is best (if inelegantly) described as mostly rubbish. It consists primarily of nasty comments against Bahnsen, Colman or Wells based upon rumor,

hearsay or speculation.  It contains one piece of relevant and admissible evidence: The testimony that Colman said to Bernhard that he (Colman) had directed Foy to run the tags of the plaintiff and his former wife, and that Colman was not joking when he said it.  Aside from that one statement, there is no relevant, admissible evidence from Bernhard that would implicate Bahnsen, Wells or Colman in a conspiracy to prevent by force, intimidation, or threat the plaintiff from performing his official duties, or in a conspiracy to injure the plaintiff or his property on account of his official duties or to impede the carrying out of his duties.

Under these circumstances, there is no probative evidence that ties Bahnsen to a §1985(1) conspiracy.  Consequently, in all events, he should be dismissed from the case.

Furthermore, any conspiracy involving Colman fails unless the plaintiff can establish that there was an individual, identified or not, who conspired with Colman.  Apparently recognizing this problem, the plaintiff asserts that it was either Bahnsen or an unidentified MCSO employee that was using the MCSO truck in the plaintiff's neighborhood.  This is no answer to the requirement of a co-conspirator since the evidence establishes that the

surveillance vehicle seen in the plaintiff's neighborhood was not owned by the MCSO.  Moreover, even assuming that it was the MCSO truck, the plaintiff, who has the burden of proof, needed to show at least that it was operated by someone other than Colman.

For these various reasons, the plaintiff has not adduced evidence sufficient to establish a conspiracy covered by §1985(1).

There is, moreover, a separate reason why the plaintiff's conspiracy claim should be dismissed.  That reason is the plaintiff's admitted lack of probative evidence of any cognizable damage.

On this point, it is pertinent to iterate the following language from §1985(3):

> ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, ... the party so injured ... may have an action for the recovery of damages occasioned by such injury ..., against any one or more of the conspirators.

Consequently, an injury to persons or property is an indispensable element of a claim under §1985.  Reichenberger v. Pritchard, 660 F.2d 280, 287 (7th Cir. 1981).

In this connection, the defendants argue that the plaintiff has failed to show, and does not even allege, that he suffered injury to his person or property as a result of the purported conspiracy (Docs. 162, 164). During his deposition, the plaintiff stated that he was not prevented from performing his duties as an AUSA (Doc. 164, Ex. 4, p. 35); that none of his property was damaged; that he was not physically injured; and that he never sought medical care or counseling (id. at p. 141). The plaintiff, moreover, confirmed at the pretrial conference that he suffered no damage as a result of the purported conspiracy.[8]

Instead, the plaintiff relies solely upon the contention that, "under section 1985(1), it is NOT necessary for an injury to be plead [sic]" (Doc. 186, p. 3)(emphasis in original)(see also Doc. 164, Ex. 4, p. 34; Doc. 211, p. 6). In this regard, the plaintiff notes that 18 U.S.C. 372 criminalizes the same conspiratorial conduct in the absence of injury and argues that, "[g]iven the identical nature of both provisions," the civil conspiracy statute should similarly be construed to make the defendants liable for the conspiracy

---

[8]The plaintiff alleged in the pretrial statement that the conspiracy caused his transfer from the criminal to the civil division of the United States Attorney's Office (Doc. 211, p. 6). However, he withdrew that allegation at the pretrial conference because he admittedly had no evidence to support that contention. There is no other element of damage identified in the plaintiff's statement of damages (id.).

without proof of injury (Doc. 186, pp. 3-4; <u>see</u> <u>also</u> Doc. 164, Ex. 4, pp. 32, 34).   However, the plaintiff has provided no authority to support this contention, and the Supreme Court has said the contrary.   Thus, the Court stated in <u>Collins</u> v. <u>Hardyman</u>, 341 U.S. 651, 659 (1950) (overruled on other grounds) (footnote omitted):

> While a mere unlawful agreement or conspiracy may be made a federal crime, as it was at common law, this statute [8 U.S.C. 47, which was the predecessor to §1985] does not make the mere agreement or understanding for concerted action which constitutes the forbidden conspiracy an actionable wrong unless it matures into some action that inflicts injury.

This statement is simply a reflection of the plain language of §1985(3), which provides a cause of action to an injured party for "recovery of damages occasioned by such injury."

Therefore, the plaintiff is wrong in contending that damage is not an essential element of a civil conspiracy under §1985(1).   Consequently, since he has not only testified that he has not suffered any cognizable damage, but he has also confirmed that position in the pretrial statement, his conspiracy claim is subject to dismissal on the basis of that additional deficiency.

IV.

The second count in the plaintiff's third amended complaint alleges that Colman violated the DPPA by directing MCSO analyst Lola Foy to perform a search of the plaintiff's and his ex-wife's names in the DMV database in order to access personal information, such as his home address, for the purpose of facilitating retaliation against the plaintiff for his successful prosecution of the MCSO officers. Colman argues that he is entitled to summary judgment on this claim because the plaintiff cannot show that Colman directed Foy to run the tags and that, in any event, there is no colorable evidence that Colman actually accessed the information for an unlawful purpose (Doc. 163).[9]

The DPPA pertinently provides (18 U.S.C. 2724(a)):

> A person who knowingly obtains, discloses, or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains, who may bring a civil action in a United States District Court.

The Act contains a list of fourteen permissible uses. 18 U.S.C. 2721(b).

---

[9]Colman also argues that the alleged violation of the DPPA is an unconstitutional application of the Commerce Clause power (Doc. 163, pp. 16-18). Although it is unnecessary to address this argument, the Supreme Court's recent decision in Gonzales v. Raich, ___ U.S. ___, 125 S.Ct. 2195 (2005), indicates that it lacks merit.

As indicated, Colman contends that he did not run the plaintiff's tag and denies that he directed Foy to do so (Doc. 164, Ex. 3, pp. 64, 73). However, as previously explained, Colman admitted saying that he did direct Foy to run the tag, but asserted that he was joking when he said it. Bernhard testified that Colman made the statement to him and that Colman was not joking. This differing testimony clearly creates a genuine dispute of fact regarding whether Colman's statement constitutes an admission that he directed Foy to perform the DMV search.

Colman argues alternatively that, assuming that he was involved in the database inquiry, he is entitled to summary judgment because the plaintiff has not shown that the act was done for an unlawful purpose (Doc. 163, p. 9 n.9; pp. 13-14). A person is liable for a violation of the DPPA when he knowingly obtains personal information, from a motor vehicle record, "for a purpose not permitted under this chapter." 18 U.S.C. 2724(a). As indicated, there are fourteen permissible uses of information. 18 U.S.C. 2721(b).

In this case, the plaintiff accepts the burden of proving the unlawful purpose of the inquiry. The burden of proof generally falls on the plaintiff as to every essential element of a claim. Further, the language of the

DPPA supports such an approach in this case, since there is no burden-shifting wording suggesting that the proving of the purpose is an affirmative defense.   See 18 U.S.C. 2724(a) (making liable a person who "obtains, discloses, or uses personal information ... for a purpose not permitted under this chapter").   Moreover, district courts have noted that it is the plaintiff's burden to establish this element under the DPPA.   See Luparello v. Incorporated Village of Garden City, 290 F.Supp.2d 341, 344 (E.D.N.Y. 2003); Cowan v. Ernest Codelia, P.C., No. 98 Civ. 5548 (JGK), 2001 WL 856606, at *8 (S.D.N.Y. July 30, 2001).

Importantly, the plaintiff acknowledged in the pretrial statement that it is his burden to prove the unlawfulness of Colman's alleged participation in the tag run.   Thus, in the pretrial statement of "Applicable Principles of Law," it states (Doc. 211, p. 7) (emphasis in original):

> In order to succeed on his claim for violation of the Driver's Privacy Protection Act (D.P.P.A.), 18 U.S.C. §§2721-2725, Plaintiff must establish:
>
> (1) that the Defendant Colman caused a DMV search to be made as to the Plaintiff; AND
>
> (2) that the search was not permitted by any exception to the DPPA.

Therefore, the plaintiff concedes that, in addition to establishing that Colman directed that the tag be run, he must also show that it was done for an impermissible purpose.

In this regard, Colman testified that he has never run a tag without a law enforcement purpose (Doc. 164, Ex. 3, p. 77). In light of this testimony, as well as the plaintiff's burden of proof, the plaintiff was required to come forward with some evidence to controvert Colman's testimony. He has failed to do so.

The plaintiff speculates that Colman's improper purpose for having his and his ex-wife's vehicle tags run was to obtain information in order to conduct surveillance on the plaintiff's home (Doc. 118, ¶21). However, the evidence establishes that the vehicle seen in the plaintiff's neighborhood was not the MCSO truck. Accordingly, the plaintiff has no evidence tying Colman to the surveillance of his home. Another factor that disconnects the surveillance from the running of the tags is that the address at which the alleged surveillance took place was different from the residence listed in the motor vehicle record. Moreover, the two events were separated by more than fifteen months. Therefore, the plaintiff has failed to raise a

genuine issue of fact concerning Colman's testimony that he has never run a tag without a law enforcement purpose.[10]

For this reason, the plaintiff has not presented any evidence demonstrating that he can carry his burden to show that Colman had the tags run for an impermissible purpose.  Accordingly, summary judgment should be granted on the DPPA claim in Colman's favor.

V.

The defendants alternatively seek dismissal of this lawsuit under this court's inherent power as a sanction for the plaintiff's bad faith conduct. Although dismissal of an action is a sanction that is to be employed sparingly, it is appropriate in the circumstances of this case.

The Sheriff filed a motion for sanctions against the plaintiff and his attorney, seeking a recovery of reasonable attorney's fees.  The motion was based upon, among other things, the allegation that at a meeting the plaintiff threatened to file a complaint regarding campaign finance violations

---

[10]It is noted that, although the plaintiff has raised a genuine issue of fact that Colman directed Foy to run the plaintiff's tag, the weight of the evidence does not seem to support that conclusion.  In other words, it appears that someone other than Colman may have directed Foy to run the tag.  The plaintiff, however, sued Colman for the DPPA violation, and, thus, is faced with countering Colman's testimony that he has never run a tag without a law enforcement purpose.

if the Sheriff did not pay him $500,000, plus an attorney's fee, as a settlement of this case (Doc. 99).  Both Bahnsen and Colman moved to adopt that motion (Docs. 125, 130), and those motions to adopt were granted (Doc. 157).  Each defendant seeks dismissal of this lawsuit as a sanction.  Because of the dispositive nature of that request, its consideration was deferred to this Report and Recommendation (Doc. 224, p. 30).

An evidentiary hearing was conducted on the motion for sanctions.  After that hearing, I found that the plaintiff's "demand was made in bad faith in an effort to coerce Wells into settling for $500,000, plus an attorney's fee, a claim with only a modest settlement value at best by threatening to disclose alleged campaign violations – matters wholly unrelated to the lawsuit – at a time when Wells was involved in a re-election campaign" (id. at p. 24).  Further, I concluded that sanctions were warranted under the court's inherent power because "[t]he use of this case as a vehicle for the bad faith demand clearly constitutes a litigation abuse defiling the judicial process" (id. at p. 27).

The question raised by the defendants' motions for adoption is whether the sanction of dismissal is justified in this case.  That sanction is

ordinarily a particularly severe one, but it nonetheless is within the court's discretion. Chambers v. NASCO, Inc., 501 U.S. 32, 45 (1991).

In this instance, the sanction of dismissal may be less drastic than an award of attorneys' fees. Thus, an award of reasonable attorneys' fees to counsel for both defendants, which undoubtedly would be substantial, would seemingly exceed any recovery that the plaintiff could reasonably expect in this case.

Furthermore, an award of reasonable attorney's fees to counsel for Bahnsen and Colman may not be a viable option. An award of attorneys' fees has already been made to the Sheriff, and his claim is presently for reimbursement of $167,000 (see Doc. 224, p. 29). Importantly, however, an award of attorneys' fees under the court's inherent power is limited by the sanctioned party's financial circumstances. Martin v. Automobili Lamborghini Exclusive, Inc., 307 F.3d 1332, 1337 (11th Cir. 2002). It seems unlikely that the plaintiff, in addition to paying an award to counsel for the Sheriff, would be in a position to pay reasonable attorneys' fees to counsel for Bahnsen and Colman.

Importantly, the dismissal of the lawsuit is not a disproportionate remedy in light of the lack of merit in the claims.  The conspiracy claim borders on frivolous, and, at least as to Bahnsen, could have supported sanctions under Rule 11, F.R.Civ.P.  The plaintiff has not adduced on the DPPA claim probative evidence of an impermissible purpose, and, even on the disputed issue of who directed the tag to be run, Colman appears to have the better of the argument.[11]

In addition, the plaintiff acknowledges that he has not suffered any actual damages.  Thus, in terms of compensatory damages, the plaintiff could recover only the $2,500 in liquidated damages authorized by the DPPA.  See 18 U.S.C. 2724(b).

The plaintiff's hope for glory is based upon punitive damages.  However, the plaintiff's egregious bad faith conduct disentitles him to any claim for punitive damages.

In light of these considerations, the dismissal of this suit is not, in this case, a particularly severe sanction.  In all events, the overriding

---

[11]Thus, two witnesses, beside Colman, stated that he was joking when he said he asked Foy to run the plaintiff's tag (Doc. 164, Ex. 1, pp. 153-54; Doc. 172-3, Ex. G, pp. 12, 14).  Further, Colman testified that he is certified to make such inquiries himself and that he normally does so (Doc. 164, Ex. 3, p. 74).

consideration in my view is that, because the plaintiff's bad faith conduct defiled the judicial process, he does not deserve any more of this court's time and effort in the prosecution of his claims.

Therefore, if the defendants' motions for summary judgment are not fully granted, I recommend that the adopted motion for sanctions be granted, and the case dismissed on that ground.

## VI.

For these reasons, the plaintiff has failed to proffer sufficient probative evidence from which a jury could reasonably find that the defendants participated in a conspiracy to prevent by force, intimidation, or threat the plaintiff from performing his duties as an AUSA, or a conspiracy to injure the plaintiff or his property on account of his official duties, or to impede the performance of those duties. Moreover, the absence of cognizable damages relating to the conspiracy claim absolutely forecloses that claim. Similarly, the plaintiff has also failed to show that, assuming Colman had directed a subordinate to perform the DMV search of the plaintiff's vehicle information, it was done for an unlawful purpose. Consequently, I recommend that summary judgment be entered for the defendants on the

conspiracy claim, and that it be entered for Colman on the plaintiff's DPPA

claim against him.

Alternatively, this suit should be dismissed as a sanction for the

plaintiff's bad faith conduct in this case.

Respectfully submitted,

DATED: OCT. 31, 2005          THOMAS G. WILSON
                              UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and

recommendations contained in this report within ten days from the date of its

service shall bar an aggrieved party from attacking the factual findings on

appeal.  28 U.S.C. 636(b)(1).